The plaintiff gave in evidence a mortgage from Hanson Kelly for the land in dispute, executed to the State Bank of North Carolina, dated 1 August, 1818, to secure the sum of $16,000.
Also, a deed from the State Bank to T. P. Devereux, lessor of (339) the plaintiff, purporting to convey its interest in the aforesaid 5 acres, dated 18 March, 1822.
Also, a certified copy of a deed of bargain and sale, from Hanson Kelly to Marsoratti, the defendant, for the tract of 5 acres, and also for two other acres adjoining the same, and not included in Kelly's mortgage deed to the State Bank. This was dated 31 December, 1818.
Also, a deed from Marsoratti to Burgwin and Reston, conveying one moiety of the premises which had been conveyed by Kelly to Marsoratti, dated August, 1819; a deed from Reston to Burgwin for the same, dated 14 December, 1819; and a deed from Burgwin to Campbell, Holmes, and London, trustees, to secure a debt due the Bank of Cape Fear, dated 15 December, 1819. This deed conveyed much real and personal property, including that which Marsoratti had conveyed to Burgwin and Reston.
The defendant then exhibited the original deed from Hanson Kelly to Marsoratti, dated 31 December, 1818, and proved that Charles J. Wright, who was at that time president of the Wilmington branch of the State Bank (to which the debt was due which the mortgage was given to secure), wrote the deed and became a subscribing witness *Page 187 
thereto; and, further, that Marsoratti knew before his purchase from Kelly that the land had been mortgaged by Kelly to the State Bank.
He also proved that the State Bank verbally authorized Kelly to find a purchaser for the 5 acres which he had mortgaged, and to sell the same on a credit for $3,000 (the agreed value of the 5 acres), to be secured by a bond or note satisfactory to the State Bank; and when the sum was so secured, the bank was to relinquish its lien under the mortgage. Marsoratti agreed to give Kelly $4,000 for the lands conveyed in the deed of 31 December, 1818; $1,000 whereof was paid down and $3,000 was to be secured to the State Bank by a good note; and before Marsoratti purchased of Kelly he called on the officers of the State Bank at Wilmington to know upon what terms they would release their lien upon the 5 acres, and was informed that it should be done (340) upon Kelly's securing to them the payment of $3,000.
The defendant then offered in evidence resolutions of the State Bank, Wilmington branch, declaring that whenever the proprietors of the steam sawmill should pay $3,000, the bank would relinquish the mortgage made by Kelly, and showing that Burgwin and Reston afterwards offered their note for $3,000, indorsed by Bridges, on renewal of which, when it became due, the bank required another indorser; Burgwin did not give another indorser, but in lieu thereof deposited the notes of other persons as collateral security, to be retained until a satisfactory and unexceptionable note was given.
On 15 October, 1820, the note of Burgwin for $3,000, indorsed by Devereux and C. J. Wright, was offered for discount by Wright at the Wilmington branch of the State Bank, and was discounted, and the proceeds placed to the credit of Wright, and this note was deemed by the bank satisfactory and unexceptionable, and the notes deposited were ordered to be given up to Burgwin. On the morning of 18 April, 1820, C. J. Wright, then president of the bank, came into the banking room, drew a check for $3,000, and, acting officially, directed the clerk to credit Hanson Kelly's account with $3,000, and to charge Wright's account with the same; and after the entries were thus made Wright declared that the State Bank had no longer any interest in the 5 acres of land; that it was extinguished, and that Marsoratti's title thereto was now good and complete. There was no evidence of any payment on the mortgage from Hanson Kelly, except the $3,000 paid by Burgwin's note, which was made long after the time when the money due by the mortgage was payable. The bank executed no formal release of its interest.
Varions questions were made below on these facts, all of which were determined for the plaintiff. The only question here made was on the act of 1789, ch. 312, N. R. (341) *Page 188 
I think it was the object of the act of 1789, Rev. ch. 312, entitled "An act for the more easy redemption of mortgages," to put it in the power of the courts of law to finally put an end to suits brought under deeds of mortgage against mortgagors as long as the parties thereto stood in their original simple state of mortgagee and mortgagor, and their relation to each other in that respect had not become more complex and encumbered with subsequent arrangements as in the present case. For instance, Kelly became indebted to the branch State Bank, and gave a mortgage on 1 August, 1818, to secure to them the sum of $16,000 for the land in question and other property; this suit is brought for that property, or part of it. What, under the act, is expected to be done? Why, that all the principal money and interest due on such mortgage shall be brought into court. This has not been done. But it is said the reason is that Kelly and the bank had entered into new arrangements; that Marsoratti, who claims the island through Kelly, shall have the island provided he pays $3,000 and interest. Be it so. This is a new arrangement between the parties since the mortgage was given, and it is upon such arrangement that the defendants argue that they are entitled to the benefits of this act of Assembly, and not upon the original contract under the mortgage. But I am of opinion that this Court, or the court below, have not cognizance of this second contract under that act of Assembly, evidenced by bank resolutions and the note discounted in the bank in part discharge of Kelly's debt; these are circumstances which the defendant has it in his power to make available, as far as at present appears, in some other way than by this application to have this ejectment dismissed upon his proving that he has paid $3,000 in conformity to the second agreement that he made with the bank. I think we have no authority under that act to incorporate the second agreement (342) of the parties with the first which they made when the mortgage was given, and act upon both. Were we to be led off from the beaten road by this after agreement, there is no certainty where we should stop. Agreement after agreement might present itself, all connected with the original agreement under the mortgage. It has assumed too complex a shape to be adjusted in this action under that act of Assembly.
PER CURIAM. No error. *Page 189